**Harvey N. LOYD et al., Plaintiffs,**

v.

**Vear V. DOUGLAS et al., Defendants.**

**Civ. No. 8-2208-C-2.**

United States District Court,
S. D. Iowa,
Central Division.

July 1, 1970.

Edmund E. Fleming, Boston, Mass., for plaintiffs.

James F. Fowler, Philip T. Riley, John F. McKinney Jr., Gary H. Swanson, Robert McAllister, Jack L. Briggs, M. A. Iverson, Stephen R. Gadd, Eugene E. Olson and Gerald A. Kuehn, Des Moines, Iowa, for defendants.

### MEMORANDUM AND ORDER.

HANSON, District Judge.

This action for declaratory and injunctive relief challenges the constitutionality of a police activity referred to as field interrogation. More specifically, plaintiffs allege that their constitutional rights were violated when they were stopped and questioned by members of the Des Moines police department.

■ Plaintiffs have asserted, and the Court accepts, violations of the Fourth and Fourteenth Amendments to the United States Constitution; 42 U.S.C. Section 1983, and 28 U.S.C. Section 1343 as requisite jurisdictional bases for this action. The Court finds that the objections to subject matter jurisdiction are without merit. Suffice it to say that this Complaint alleges a violation of federal constitutional rights and, therefore, the Court is totally unconcerned about plaintiffs' failure to initiate any state action. Defendants' suggestion that this Court abstain from deciding the issue herein and deferring resolution to a state tribunal is utterly and completely rejected.

■■ Defendants have moved to dismiss the claims of Harvey Loyd, John Gunn, and Roosevelt Crawford for the reason that these plaintiffs did not appear at trial. Said motion is sustained. Defendants have also moved to dismiss the claims asserted by plaintiffs against Thomas Chenoweth, individually and as Chief Administrator of the City of Des Moines; Thomas Urban, individually and as Mayor of Des Moines, and the six city councilmen, individually and in their official positions. The evidence at trial was completely devoid of any showing that these men were involved in any way with the policy here in question. Consequently, plaintiffs' claims against these defendants are dismissed.

The police activity challenged herein is, as noted above, commonly referred to as field interrogation. The Court believes it will be helpful to set out the

mechanics of this practice as employed by the Des Moines police as well as the avowed objectives and purposes of such a practice. Field interrogation refers to the stopping and questioning of individuals by the police. The person stopped may be on foot or traveling in an automobile or other motor vehicle. Once the stop is made, police officers usually question the stoppee concerning his identity, address, destination, immediate previous whereabouts, purpose for being where he is, and any other information the officer feels germane. In certain instances, an arrest may follow the stopping. In the majority of cases, however, there is no arrest made nor is there a search made of any kind. As an adjunct to the stopping and questioning, the officer fills out a card designated as a Form 187 for the purpose of recording the information either elicited from or observed about the stoppee. These forms if filled out completely would contain the following data: stoppee's name; address; officer involved; date, time, and location of the stop; sex; age, and other physical characteristics; and the circumstances involved. The circumstances involved are the officer's reasons for stopping the person.

After the stop and questioning is completed, the officer returns the Form 187 to the police department. The Form 187 is copied and then distributed to various bureaus within the department.

This practice of field interrogation is encouraged, supported, and officially sanctioned by the Des Moines police department under the direction of Police Chief Wendell Nichols. Officers are given special instruction as part of their police training in field interrogation. The overall objective of this practice is stated to be that of preventing crime and apprehending criminals.

In training policemen in the technique of field interrogation, the police department has established guidelines for the officer to utilize in determining whom to interrogate. Obviously, because of the infinite variety of situations that an officer may face in street encounters with citizens, it is impossible to detail exact guidelines which would cover every situation. For that reason, general guidelines are set forth which depend in large part on the officer's good judgment. The general guideline is that persons should be stopped whenever the circumstances are such that an officer's suspicion of possible criminal activity or involvement is aroused. Suggested factors which may constitute "suspicion-arousers" are stated to be unusual dress or appearance, unusual actions, loitering in unusual locales, lateness of the hour, and so forth.

Police officers are instructed that if a person refuses to answer the posited questions and no grounds exist for arrest, the stoppee should not be detained nor should coercion or intimidation be used to obtain the information for the field interrogation reports. Consequently, in theory at least, the success of field interrogation rests heavily on the voluntary participation by the persons stopped.

Presumably as a safeguard against abuse of field interrogation, a superior officer reviews the Form 187's turned in by the men under his supervision. If the superior officer finds that the circumstances as shown on the Form 187 were insufficient reasons for the stop, the officer involved is so informed and cautioned. To assist reviewing procedures, officers are encouraged to be as exact as possible when listing the circumstances surrounding the stop.

The Form 187's are designed to assist the police in the investigation of crimes. When some kind of criminal activity is reported to the police department, the Form 187's may yield valuable information concerning who was in that particular area at a particular time. The evidence at trial, however, demonstrated that this purpose, while perhaps theoretically sound, has in actual practice produced few results in helping solve crimes.

Access to the information on these forms is mainly restricted to police busi-

ness. Chief Nichols did state, however, that probation and parole officers have been granted access to these reports. The Form 187's are kept for diverse periods of time depending on the bureau involved. For example, the Intelligence Bureau retains copies of the Form 187's permanently whereas some other bureaus purge the Form 187's from the files every two to three years.

The issue thus presented to the Court is whether the police practice of field interrogation as described above violates the Fourth Amendment's prohibition against unreasonable searches and seizures.

■ The Fourth Amendment is one of the most fundamental protections guaranteed to citizens in a democratic country. This Amendment establishes "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." This protection is made applicable to the states and its many subdivisions through the Fourteenth Amendment. Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

The practice of field interrogation challenged herein does not involve searches and therefore the Court is faced initially with the issue of whether "stop and question" encounters constitute "seizures" as intended by the Fourth Amendment.

The scope of Fourth Amendment protection has been explicated by the courts numerous times. It has been held by the United States Supreme Court that the protection of the Fourth Amendment applies at all times whenever an individual has a reasonable expectation of privacy. Katz v. United States, 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Thus, it has been held that persons driving automobiles and persons walking on the streets are protected by the Fourth Amendment. Terry v. Ohio, 392 U.S. 1, 9, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); Carpenter v. Sigler, 419 F. 2d 169 (8th Cir. 1969). The recent Supreme Court decision of Terry v. Ohio, supra, provides the standards in determining whether a certain act or course of conduct constitutes a Fourth Amendment seizure:

> Whenever a police officer accosts and restrains his freedom to walk away, he has 'seized' that person. 392 U.S. at 16, 88 S.Ct. at 1877.

> Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority has in some way restrained the liberty of a citizen may we conclude that a seizure has occurred. 392 U.S. at 19, n. 16, 88 S.Ct. at 1879, n. 16.

> We * * * reject the notions that the Fourth Amendment does not come into play at all as a limitation upon police conduct if the officers stop short of something called a 'technical arrest' or a 'full-blown search.' 392 U.S. at 19, 88 S.Ct. at 1879.

■ Certainly when a police officer requests an individual to stop for the purpose of conducting a field interrogation, that individual is, in a sense, restrained. His freedom is restricted in that he must take the time to stop and at least listen to the questions propounded. Furthermore, although the officer does not employ physical force as a means of restraint, his uniform and badge and, in some instances, his police car are sufficient to constitute the requisite show of authority. The Court is unable to distinguish with any meaningful difference the situations discussed in two recent Eighth Circuit opinions which were held to be "seizures" from the situation presented herein. United States v. Unverzagt, 424 F.2d 396 (8th Cir. 1970); Carpenter v. Sigler, supra. Consequently, the Court finds that the stop and question practice employed by the Des Moines police does constitute seizures of persons within the purview of the Fourth Amendment. Bailey v. United States, 128 U.S.App.D.C. 354, 389 F. 2d 305, 314–315 (1967) (concurring

opinion); Yam Sang Kwai v. Immigration & Naturalization Service, 133 U.S. App.D.C. 369, 411 F.2d 683 (D.C.Cir. 1969); Cook v. Sigler, 299 F.Supp. 1338, 1343 (D.Neb.1969).

However, simply denominating such encounters as seizures does not automatically render field interrogation unconstitutional. The Fourth Amendment does not forbid all seizures but only unreasonable seizures.

The recent decision of Terry v. Ohio, supra, furnishes important standards as to the reasonableness of searches and seizures in those police-citizen street encounters not involving trips to the station house. Although Terry involved a police "stop and frisk" practice and the subsequent admissibility at trial of evidence confiscated during the frisk, the Supreme Court did provide the general standards which are applicable to the instant case.

Terry establishes the proposition that the legitimate governmental interest of effective crime prevention and detection allows a police officer, even though no probable cause for arrest exists, in appropriate circumstances and in an appropriate manner to stop and question a person for the purpose of investigating possible criminal behavior. 392 U.S. at 22, 88 S.Ct. 1868.

Terry also furnishes the proper analysis for determining the constitutional validity or reasonableness of field interrogations. Terry indicates that the judicial inquiry into the question of reasonableness is a dual one. A reviewing court must objectively evaluate the specific facts and determine (1) whether the facts warranted the intrusion on the individual's Fourth Amendment rights, and (2) whether the scope of the intrusion was reasonably related to the circumstances justifying the interference in the first place.

Thus, the Court must analyze the instant case in light of the fact situations which have been established by the evidence. A fortiori, the reasonableness of any particular seizure must be assessed in light of the specific facts and circumstances pertaining to that seizure. As the Supreme Court stated in Terry in reference to reasonableness of a search or seizure, "[N]o judicial opinion can comprehend the protean variety of the street encounter and [a court] can only judge the facts of the case before [it]. 392 U.S. at 15, 88 S.Ct. at 1876.

Consequently, rather than subjectively apprising field interrogation in the abstract as to potential abuses of Fourth Amendment protections, the Court must employ an objective, factual analysis of specific stop and question situations. For that reason, it is necessary that, before the Terry tests of reasonableness can be applied, the Court review in some detail the evidence offered at trial in respect to field interrogation as applied to particular individuals.

The first witness called by plaintiffs was Robert Bogges, age 66. Mr. Bogges testified that he had been stopped by the police and questioned as to identity and destination on four separate occasions. All stops were after 12:00 midnight in the business district of Des Moines. Mr. Bogges was on foot each time and was returning home from his work as a night janitor. On two of the stops, the police asked only for identification. The stops consumed only two or three minutes of time. Mr. Bogges testified that the police were always polite and never physicially touched or verbally abused him. Further evidence established that Mr. Bogges was stopped by the police on one of those four occasions because he matched the description of a robber. Another of the stops was made by the police after they had received a report that an elderly Negro was armed with a gun in a tavern. Mr. Bogges was stopped in close proximity to the tavern.

Carlo Brown, 23, a plaintiff in this case, testified that he had been stopped many times by the police. Brown related few specifics as to any one stop and consequently, the Court has a meager

fact situation to consider. Mr. Brown did testify that some of the stops resulted in arrests. Mr. Brown stated that he simply did not like the police stopping him. Further evidence was presented showing that plaintiff Brown has been arrested many times. The defendants produced evidence that Mr. Brown was stopped once at 4:30 a. m. in a semi-business area of Des Moines and also once in regard to a reported incident involving Brown and a companion who had been reported to be threatening persons with a weapon at a local drive-in.

Plaintiff Michael Fowler testified that he had been stopped by the police on more than one occasion. Again, as with many of the witnesses, Mr. Fowler was unable to pinpoint the crucial elements of time, place, or date of these stops. One stop apparently resulted when the police observed Fowler attempting to hitch-hike. Other evidence showed that Fowler had been stopped several times on foot very late at night in business areas. One stop was made because Fowler fit the description of a hold-up man. This stop was made an hour after and one block away from the hold-up scene. Mr. Fowler characterized the police officers' conduct on these stops as "business-like" and absent any verbal threats. Mr. Fowler stated that he did not like to be stopped.

The next witness, Steven Green, related his experiences in respect to stop and question practices employed by the Des Moines police. Again the witnesses' relation of the instances he was stopped was very vague in terms of time, place, or date. Also, as was true of most of the witnesses, Green did not know the names or badge numbers of the officers who made the stops in question. Mr. Green further testified that he thought the police were "just doing their job." Other evidence established that on occasion Green had been stopped in the company of other persons who were also questioned.

Witness Ron Johnson testified that he was a new resident of Des Moines and was employed as a bartender. He worked from 9:00 p. m. to 2:00 a. m. Mr. Johnson was one of the few witnesses who could specifically detail the stop that was made. He was stopped on November 13, 1969 at 2:30 a. m. returning from work to his residence. Mr. Johnson was on foot. He recalled that a police car pulled to the curb and that he walked over to the officers on his own accord. The officers then asked him the usual questions. Mr. Johnson refused to answer. The officers then arrested him for intoxication. Testimony from the officer involved established that Johnson was wearing dark clothing on that particular night, that the area had a high crime rate and that Johnson was a stranger in the area. The officer also stated that Johnson became belligerent and smelled of alcohol and thus the subsequent arrest. The legality of that arrest is not before the Court and the Court makes no comment on it.

Edward Dial, 17, was stopped on three occasions. Two of these stops were apparently in daylight hours. Again, the Court does not have a clear fact situation. Testimony from police officers was that Dial had been stopped on one occasion at 3:20 a. m. on September 22, 1969 after he had been observed near the rear of a business where there had been break-ins.

Charles Lee, 19, related a stopping occurring four to five years ago. He also told of other stops in general terms. Police testimony demonstrated that Lee was stopped one time very late in an area where there had been break-ins. Another time, Lee was stopped after a vending machine had been broken into. An eyewitness had gotten the license number of the vehicle and a description of the person involved. The vehicle was stopped the next day and Lee, who was a passenger in the car, was questioned.

Witness Fred Karnes testified that he had never been stopped by the police. A. D. Brown testified that he had been stopped once at 1:00 a. m. in a car near Drake University. Further testimony established that there had been a series

of disturbances in this area during this time.

Witness Ronald Simmons' testimony was that he had been stopped 20 times by the police. Again, the Court does not have specifics as to those stops.

Lawrence Paul, 25, related an incident where he had been stopped. His car had broken down at 12:30 a. m. and he was on foot. The police stopped him. Mr. Paul testified that it was his impression that the officer was really concerned for his safety.

Michael Smith, 15, stated he had been stopped on numerous occasions. Police officers related several incidents involving stops of Smith. Smith was stopped at 12:30 a. m. in an area where there had just been a report of malicious destruction of property. Police asked Smith if he had seen anyone in the area. Smith was also stopped on July 11, 1969 at 3:00 a. m. after a break-in had occurred. Smith fit the description of one of the persons reportedly seen in the break-in. The stop was made some ten to fifteen minutes after and one block away from the break-in. Furthermore, Smith was not wearing a shirt at the time he was stopped. Another stop occurred at 2:30 a. m. in June 1969. Police were investigating an auto theft and a break-in. Fifteen minutes after these crimes were reported, police saw Smith and four or five other persons running in the opposite direction some twenty blocks from the reported break-in.

The last witness for the plaintiffs, James O'Day, 51, testified about the times he had been stopped. Mr. O'Day related that he did night janitor work and the stops occurred during late hours. Mr. O'Day was unclear in one instance whether it was the Des Moines police or the Windsor Heights police who had actually stopped him.

Under the *Terry* approach, the first question for the Court's concern is whether these seizures (stops) were warranted. In other words, do the circumstances surrounding the stop and question encounters, as detailed above, permit the conclusion that these field interrogations were unreasonable. The Court thinks not.

The Supreme Court in *Terry* recognizes the legitimacy of police activity in respect to the investigation of possible criminal behavior. This Court therefore need only determine whether the circumstances involved in the field interrogations in question were sufficient to permit the police to conclude that there was possible criminal behavior present.

Certainly, in those instances where a crime had been reported and a person was stopped because he fit the description of the criminal, or was in proximity to the place where the crime occurred, these circumstances permit the use of field interrogation. The Court is not going to attempt to define all the situations where a policeman may have the right to stop individuals on the street. Any such attempt given the infinite variety of circumstances that may occur would be futile and unnecessary. As stated before, the Court in determining the legality of a seizure is concerned only with the fact situations with which it is presented. In each of the factual encounters described by the plaintiffs and the other witnesses, the elements of time, unusual appearance, suspicious activity, investigations of crimes, and so forth are a common thread. The Court is unable to single out even one situation involving a field interrogation that was presented to the Court in sufficient detail and conclude that the police were unreasonable in the intrusion or had exceeded their authority. The stop in respect to Ron Johnson deserves special comment. Mr. Johnson testified that he initiated the contact with the police and the Court has attached some significance to this fact in weighing his testimony. Clearly, there is serious question whether this "stop" would even constitute a seizure.

As for the testimony of the other witnesses including plaintiffs, the Court believes the following observations con-

cerning that testimony are in order. Many of the situations presented to the Court concerning a particular stop and question are almost factually sterile. Most of the witnesses could remember being stopped but little else. This lack of specificity as to time, place, date or the officer involved also made it difficult if not impossible for the defendants to offer any evidence on their behalf relating to these alleged incidents. Furthermore, many of the stops took place anywhere from two to five years ago which perhaps accounts for the unfortunate lack of specificity. Thus, much of the testimony concerning particular police-citizen encounters is so general that this Court can afford little weight to this evidence. It is almost axiomatic that where issues of illegal searches or seizures are concerned, a reasoned judgment can be rendered only upon concrete and well-defined factual situations.

■■■■ However, there is a much more cogent reason for minimizing the weight of the testimony in this case. As the Court has repeatedly stated, the reasonableness of a particular seizure is governed by the facts solely involved therein. The Court has previous hereto, in a separate Memorandum and Order, ruled that this action is not to be maintained as a class suit. Consequently, since three of the named plaintiffs have had their causes dismissed, there are only two plaintiffs left in this case, Carlo Brown and Michael Fowler. *A fortiori*, the main concern is whether the rights of Carlo Brown and Michael Fowler have been circumscribed by the police. None of the witnesses testified in respect to the stops of which these plaintiffs complain. Rather, each witness testified as to stops in which he was personally involved and which had nothing to do with plaintiffs. When the direct evidence in respect to plaintiffs is considered, the Court concludes that plaintiffs have failed to sustain their burden of proof that there were insufficient circumstances to permit the police to make the stops in question.

Plaintiffs have offered a random sampling of copies of recorded field interrogation reports, approximately 300 in number. Some of these reports plaintiffs contend prove that the underlying stop was unreasonable.

■■■■ If the Court were to assume that the constitutionality of a particular field interrogation depended on the accuracy of the policeman in filling out a written report, then certainly the stops as evidenced by these reports would be patently unreasonable. For example, the Court under plaintiffs' theory must assume that if the report does not list any circumstances for a particular stop, then there were none. Plaintiffs have not sought to substantiate these reports in any way. The stoppees listed on these reports are not plaintiffs in this action nor were they called as witnesses. The Court finds little, if any, legal merit in plaintiffs' reasoning. There is no law that a policeman must keep reports let alone accurate reports of persons he may question. No doubt an accurate recording of the circumstances surrounding the stop is desirable from a practical standpoint but it is not legally required. Thus, the Court finds that these reports have no direct bearing on the circumstances surrounding the stops of plaintiffs, and, further, that these reports insofar as they might establish a policy should be afforded minimal weight.

The final step of the *Terry* analysis is the determination of whether the scope of the seizure was reasonably related to the circumstances which justified the interference in the first place. The scope in the instant case involves just questioning whereas in *Terry* there was a frisk involved.

The questions asked by the police pertain to identity and, most usually, purpose for being in a particular place at a particular time. The reasonableness of the scope of the questioning can be best viewed from what the witnesses themselves testified. While most of the witnesses stated they did not like being questioned, there were few complaints as

to the policeman's method of conducting field interrogation. Moreover, the questioning was usually very brief lasting no more than a few minutes. The Court concludes that if the police have the right to stop persons on foot under appropriate circumstances, then the police have the right to ask questions in an appropriate manner. This is not to say that the police can compel answers but only that they have the right to ask questions.

As for those persons who are stopped in cars, since the only purpose is to question, it would seem to be beyond the scope of the seizure to request that the person step out of the car. However, the Court is mindful of the danger a policeman faces in questioning suspicious persons, especially at night, while that person is seated in an automobile. Thus, the request to step out of the car for purposes of questioning does not circumscribe the reasonableness of the scope of the seizure. Carpenter v. Sigler, 419 F.2d 169, 172 (8th Cir. 1969).

Consequently, applying the *Terry* analysis to the facts of this case and remembering that in this area the Court must proceed on a case by case approach, the Court finds that the field interrogations complained of by plaintiffs do not violate the Fourth Amendment or any other constitutional guarantee.

The Court is not implying that field interrogation cannot be used abusively in violation of the Fourth Amendment because it most assuredly may be. Furthermore, no doubt the practice of stop and question as described herein represents the last step before crossing into the territory marked "unlawful seizures." The dividing line between justified and unjustified stops, although a touchy boundary, is necessary and valid. To hold field interrogation unconstitu-

tional *per se* would require that a police officer be armed with probable cause for arrest before he could make even the simplest inquiry into matters requiring at least minimal investigation. Such a result would be detrimental to effective law enforcement and harmful to society as a whole. Consequently, while the Court has stated that there may be abuses of field interrogation, the Court has reached its decision because plaintiffs have failed to prove any such abuse in the instant case.

There has been no complaint in this case of the cards used by the police in the recordation of information gathered during the field interrogation. Thus, while the Court views these cards and their subsequent use and permanency with some trepidation, the questions of whether a stoppee is entitled to a copy of that which is kept of record, the permissible permanency of these records, and their allowable use are left for another day. The Court simply notes that these matters may in the future raise some problems not here ruled upon.

Accordingly, it is hereby ordered that defendants' motion to dismiss the claims of Harvey Loyd, John Gunn, and Roosevelt Crawford is sustained and

It is further ordered that defendants' motion to dismiss plaintiffs' petition as to Thomas Chenoweth, Thomas Urban, and the Des Moines city councilmen is sustained, and

It is further ordered that judgment shall be entered for the defendants and against the plaintiffs, and

It is further ordered that each party will bear his own costs.

It is ordered that the foregoing shall constitute the Findings of Fact, Conclusions of Law and Order for Judgment in this case. Rule 52(a) of the Federal Rules of·Civil Procedure.