STATE of Iowa, Appellee,

v.

Fred Louis LAMP, Appellant.

No. 66105.

Supreme Court of Iowa.

July 21, 1982.

John C. Wellman of Polk County Offender Advocate, Des Moines, for appellant.

Thomas J. Miller, Atty. Gen., Michael K. Jordan, Asst. Atty. Gen., and Dan L. Johnston, Polk County Atty., for appellee.

SCHULTZ, Justice.

Defendant, Fred Louis Lamp, appeals from his conviction of murder in the first degree in violation of sections 707.1 and 707.2, The Code 1979. He advances various allegations of error on the part of the district court in holding certain evidence presented by the State admissible at trial. We find no merit in defendant's assignments of error and affirm his conviction.

On May 10, 1980, at approximately 12:35 a.m., Mr. and Mrs. Patrick M. Hoffman found sixteen-year-old Melody Oliver lying face down in the middle of Northwest 107th Street near 70th Avenue in Des Moines. She was partially unclothed and said she had been raped and stabbed. Mr. Hoffman went to a nearby residence and made a telephone call for emergency assistance, while Mrs. Hoffman remained with Miss Oliver. At this time and again when Polk

County Deputy Sheriff Thomas L. Pope arrived, at approximately 12:45 a.m., Miss Oliver stated that her assailant was approximately thirty-one years old, that he said his name was Fred, and that he was driving a blue van. She also said she had been there for a long time, that her injuries were very painful, and that she knew she was dying. Miss Oliver was transported to Broadlawns General Hospital by ambulance, where she expired at approximately 3:20 a.m.

Defendant was charged with and, following a jury trial, convicted of first-degree murder. He appeals, alleging error on the part of the district court, Dale Missildine, J., in overruling a pretrial motion to suppress and on the part of the trial court, Joel D. Novak, J., in overruling evidentiary objections at trial. Defendant contends the district court erred: (1) in refusing to suppress evidence obtained as a result of an allegedly unreasonable stop of his motor vehicle; (2) in refusing to suppress evidence allegedly obtained pursuant to an unlawful warrantless search of his vehicle; (3) in refusing to suppress evidence allegedly obtained pursuant to an unreasonable search of his person; (4) in refusing to suppress evidence obtained pursuant to incustody interrogation in violation of his right to counsel; and (5) in refusing to suppress evidence obtained pursuant to a search warrant issued on the basis of unlawfully seized evidence. He asserts the trial court erred: (1) in admitting into evidence a law enforcement officer's hearsay testimony as to the results of other officer's investigations concerning the homicide, and (2) in admitting into evidence without an adequate foundation showing a proper chain of custody the results of a blood analysis.

I. *Reasonable cause to stop the vehicle.* Defendant first contends that his vehicle was stopped by a law enforcement officer without probable cause in violation of his rights under the fourth and fourteenth amendments to the United States Constitution. When constitutional rights are at issue, we find the facts de novo. *State v. Dickerson,* 313 N.W.2d 526, 530 (Iowa 1981).

At the scene where Miss Oliver was found, Deputy Pope advised Johnston City Policeman Kent Morton of Miss Oliver's description of her assailant. Officer Morton responded that the description matched that of defendant, who was a suspect in a couple of sexual abuse cases near Hoover High School in Des Moines.

Later, while investigating an automobile accident at approximately 2:00 a.m., Deputy Pope met Mark Bowersox, a Polk City Policeman. He informed Officer Bowersox of the rape and stabbing, the description of the assailant, and that defendant was a suspect. At approximately 4:20 a.m. Officer Bowersox observed a vehicle traveling southeasterly toward Polk City on Northwest Madrid Drive. The vehicle appeared to be moving rather slowly. Officer Bowersox became curious and followed it; he discovered that it was a blue van. As the van approached Polk City, it crossed the center line into the left lane, but returned to the right lane. It then came to a complete stop at the intersection of Third and Broadway Streets, although there was no stop sign at the intersection. Officer Bowersox then stopped the van on Third Street (Highway 415). The driver got out and met the officer at the rear of the van. The officer asked for the driver's license and discovered that the driver was defendant.

It is well settled that the fourth amendment requires reasonable cause to stop a vehicle for investigatory purposes. *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889, 906 (1968); *State v. Cooley*, 229 N.W.2d 755, 759 (Iowa 1975). When a stop is challenged on the basis that reasonable cause did not exist, the State must show that the stopping officer had "specific and articulable cause to support a *reasonable belief* that criminal activity *may* have occurred." *State v. Aschenbrenner*, 289 N.W.2d 618, 619 (Iowa 1980) (emphasis added). Circumstances giving rise to suspicion or curiosity will not suffice. *State v. Dixon*, 241 N.W.2d 21, 23 (Iowa 1976). The officer is bound by the true reason or reasons for making the stop; that is, the officer may not rely on reasons that he or she could have had but did not actually have. *Aschenbrenner*, 289 N.W.2d at 619. If the State fails to meet its burden, the evidence obtained as a result of the stop must be suppressed. *State v. Reese*, 259 N.W.2d 793, 796 (Iowa 1977).

In this case Officer Bowersox clearly had reasonable cause to stop defendant: (1) he was investigating a specific crime; (2) he had been given a description of the assailant and the vehicle he was driving; and (3) the perpetration of the crime was reasonably close in time (approximately four and one-half hours) and distance (approximately five miles) to the investigatory stop under the circumstances. When a crime has been committed it is constitutionally permissible for law enforcement officials to stop a vehicle matching the description of that used by the assailant, in an area reasonably close in proximity to the place where the crime occurred, and request germane information, such as identification, destination, and reason for being in the area. *See Loyd v. Douglas*, 313 F.Supp. 1364, 1370 (S.D.Iowa 1970); *cf. State v. Dixon*, 241 N.W.2d 21, 22–23 (Iowa 1976) (officers who, after observing automobile occupied by four black males depart from narrow residential street in all-white area, received radio dispatch of armed robbery by black males in area and were aware automobile was traveling in direction away from scene of robbery had reasonable cause to make investigatory stop).

Furthermore, although peace officers cannot use false pretenses or subterfuge as the basis for an investigatory stop, *State v. Farrell*, 242 N.W.2d 327, 329 (Iowa 1976), reasonable cause exists when an officer observes unusual conduct leading the officer to conclude that criminal activity may be afoot. *State v. Donnell*, 239 N.W.2d 575, 577 (Iowa 1976). The record reveals that such conduct existed in the present case. Together, the facts that defendant was traveling unusually slow, crossed the centerline, and stopped at an intersection at which there was no stop sign are circumstances justifying an investigatory stop.

II. *Warrantless search of vehicle.* Upon discovering the identity of the driver, Officer Bowersox radioed the Sheriff's Department and was informed that Sheriff's deputies wanted to talk with defendant. Defendant agreed to the conversation and waited in the backseat of the officer's patrol car. Officer Bowersox advised defendant of his *Miranda* rights. Three deputies arrived within ten minutes. Deputy Charles N. Collins again advised defendant of his *Miranda* rights, and defendant took a seat in the rear of the deputies' patrol car. Deputy Collins then walked over to defendant's van, shined a flashlight through the windows, and noticed that there appeared to be blood on a pail in the rear of the van.

Defendant claimed that the deputy's observation constituted a warrantless search that was not supported by probable cause and exceeded the scope of a search incident to an investigatory stop under *Terry.* The district court overruled defendant's motion to suppress on the basis that the search fell within the "plain view" exception to the fourth amendment's warrant requirement. We agree that the evidence was admissible.

When law enforcement officials have lawfully stopped a vehicle on a public way, it has consistently been held that an *observation* of items in plain view in the interior of the vehicle does not constitute a search. *See, e.g., United States v. Hood,* 493 F.2d 677, 679–80 (9th Cir. 1974); *United States v. Booker,* 461 F.2d 990, 991–92 (6th Cir. 1972); *State v. Post,* 98 Idaho 834, 838, 573 P.2d 153, 157 (1978); 1 W. LaFave, *Search and Seizure* § 2.5 at 355–56 (1978). The rationale for this position is that there is a diminished expectation of privacy in an automobile, the occupants and contents of which are exposed to the "plain view" of the public when used or parked in public places. *See United States v. Chadwick,* 433 U.S. 1, 12, 97 S.Ct. 2476, 2484, 53 L.Ed.2d 538, 549 (1977). Thus, a law enforcement officer who is rightfully at the location where the observation is made, stands in essentially the same position as a private citizen making the same observation. When the officer stops the automobile prior to making the observation, the lawfulness of the stop must, of course, be determined. W. LaFave, *supra,* § 7.5 at 591; *see e.g., Hood,* 493 F.2d at 680; *People v. Waits,* 196 Colo. 35, 40, 580 P.2d 391, 394 (1978) (en banc); *State v. Chattley,* 390 A.2d 472, 476 (Me.1978). Furthermore, the fact that artificial light is used to illuminate articles that would be readily visible in daylight does not affect the validity of the observation. *See, e.g., United States v. Johnson,* 506 F.2d 674, 676 (8th Cir. 1974), *cert. denied,* 421 U.S. 917, 95 S.Ct. 1579, 43 L.Ed.2d 784 (1975); *Waits,* 196 Colo. at 40, 580 P.2d at 394; *People v. Bombacino,* 51 Ill.2d 17, 22, 280 N.E.2d 697, 700 (1972); *State v. Cullor,* 315 N.W.2d 808, 811 (Iowa 1982); *State v. Donnell,* 239 N.W.2d 575, 577 (Iowa 1976).

Here, defendant had been lawfully stopped for investigative purposes. The observation thus occurred at a place where Deputy Collins had a right to be. It is also undisputed that the interior of defendant's vehicle was not searched prior to the issuance of a search warrant. We therefore find the circumstances of the observation to be constitutionally permissible.

III. *Search of defendant's person.* Defendant was taken to the Polk County Sheriff's Patrol headquarters for questioning and his van was impounded and taken to Bill's Towing Service in Des Moines. Shortly after 6:00 a. m., after questioning, defendant was asked if it would be all right to take a couple of pictures of him. Defendant was wearing two shirts; he was asked to remove the outer, long-sleeve shirt, which he did. The deputies observed and photographed what appeared to be scratch marks on both forearms. At this point, the deputies made arrangements to have additional photographs taken with a better camera. Defendant was then asked to remove his clothing. He was not wearing any underwear or socks, and deputies noticed blood stains on his upper left thigh, his right tricep, and in his right shoe. Defendant maintains this evidence was obtained illegally.

It is uncontroverted that defendant was formally arrested subsequent to the

search of his body, which was not conducted pursuant to a warrant. A warrantless search and seizure is *per se* unreasonable under the fourth amendment unless it falls within a recognized exception, such as consent, search incident to arrest, probable cause and exigent circumstances, or plain view. *State v. Schrier*, 283 N.W.2d 338, 342 (Iowa 1979).

▆ The State contends that defendant voluntarily accompanied the sheriff's deputies to the patrol headquarters and consented to the search of his body. The burden of proof is on the State to show the voluntariness of the consent by a preponderance of the evidence. *State v. Hall*, 297 N.W.2d 80, 89 (Iowa 1980), *cert. denied*, 450 U.S. 927, 101 S.Ct. 1384, 67 L.Ed.2d 359 (1981).

▆ Our review of the totality of the circumstances, as shown by the record, reveals the State has met its burden. All of the officers involved testified that defendant was cooperative and, after being informed of the reason for the investigatory stop and being advised of his *Miranda* rights, agreed to accompany the sheriff's deputies to headquarters for questioning. Defendant was concerned about his van and the personal possessions contained therein and asked if he could drive the van to headquarters. He was told it would be impounded and towed in, however. Defendant denied that he agreed to the impoundment and testified he preferred to drive the van to patrol headquarters himself. He stated that he felt he was under arrest when he was denied the right to drive his van, but he conceded that he was later told that he was free to go any time.

Defendant later told his attorney that he felt that he was going to be arrested. The evidence, however, reveals that defendant voluntarily accompanied the officers to headquarters after his concern for his van had been alleviated. Although defendant testified that he did not voluntarily remove his clothing and that he was merely following instructions of the peace officers, the officers testified that defendant consented to the photographs and voluntarily removed his clothing when requested to do so. This occurred shortly after defendant was told that he was not under arrest and was free to go and also after defendant had been given the opportunity to call his attorney.

It was the observation of the scratches, together with the subsequent observation of the blood spots, that caused the sheriff's deputies to place defendant under arrest. The preponderance of the evidence shows that prior to that time defendant was cooperative and voluntarily accompanied the sheriff's deputies to headquarters. It also shows that defendant freely consented to having photographs taken and voluntarily removed his clothing for this purpose.

Since we hold that defendant consented to the warrantless search of his person, we need not decide whether the search was constitutionally permissible under the search incident to arrest or probable cause coupled with exigent circumstances exceptions to the warrant requirement. *See Rawlings v. Kentucky*, 448 U.S. 98, 111, 100 S.Ct. 2556, 2564, 65 L.Ed.2d 633, 645–46 (1980) ("[w]here the formal arrest followed quickly on the heels of the challenged search of petitioner's person, we do not believe it particularly important that the search preceded the arrest rather than vice versa."); *Cupp v. Murphy*, 412 U.S. 291, 294–96, 93 S.Ct. 2000, 2003–04, 36 L.Ed.2d 900, 905–06 (1973) (warrantless body search of person upheld when probable cause to arrest existed and search was necessary to preserve evidence of "highly evanescent" nature). *See also Franklin v. State*, 18 Md. App. 651, 660, 308 A.2d 752, 758 (1973); *State v. Perea*, 95 N.M. 777, 780, 626 P.2d 851, 854 (Ct.App.1981).

IV. *In-custody interrogation following defendant's telephone calls to his attorney.* During the course of the interrogation preceding his arrest, defendant made two requests for permission to telephone his attorney. The first request was made approximately thirty minutes after the interrogation commenced, after defendant had given a detailed statement of his whereabouts during the night of May 9 and early morning of May 10 to another deputy. During questioning by the second deputy, defend-

ant said he could account for his time on the night of May 10. The officer responded that there was some disagreement on that matter because another peace officer could identify defendant as being at a car wash before midnight. At that point defendant said he wanted to call his attorney and the interrogating officer allowed him to use the telephone and left the room. When the officer returned to the room, defendant said that he had talked to his attorney's wife and was told to call back if he was arrested or needed to communicate with his attorney.

Shortly thereafter, another deputy entered the interrogation room and questioning continued. The questioning focused on the stabbing of Miss Oliver and the murders of two other women. When the interrogation became accusatory, defendant again said that he wanted to call his attorney. On this occasion, defendant talked with his attorney. However, there is some dispute as to what transpired thereafter. The interrogating officers testified that defendant was cooperative, answered questions, and agreed to have photographs taken. Defendant contends that on his attorney's advice he remained silent, refused to answer questions, and that he did not voluntarily consent to the photographs, but merely followed the officers' directions.

■■■ There is no evidence in the record that defendant expressly waived his right to have counsel present during questioning. As the State maintains, however, an express written or oral waiver is not constitutionally required.

> The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case. As was unequivocally said in *Miranda*, mere silence is not enough. That does not mean that the defendant's silence, coupled with an understanding of his rights in a course of conduct indicating waiver, may never support a conclusion that a defendant has waived his rights. The court must presume that a defendant did not waive his rights; but the prosecu-

> tion's burden is great; but in at least some cases waiver can be clearly inferred from the actions and words of the person interrogated.

*North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286, 292 (1979) (footnote omitted). *See also State v. Davis*, 304 N.W.2d 432, 435 (Iowa 1981) (express waiver not required under Iowa Constitution). Thus, although waiver need not be express, it must consist of some affirmative conduct indicative of voluntary, intentional, and knowing relinquishment of the right to counsel; waiver cannot be presumed from inaction or mere silence. *See Barker v. Wingo*, 407 U.S. 514, 525, 92 S.Ct. 2182, 2189, 33 L.Ed.2d 101, 114 (1972).

■■■ Our de novo review of the record reveals that defendant voluntarily, intelligently, and knowingly waived his right to counsel prior to the commencement of the interrogation. After being advised of his *Miranda* rights, defendant stated that he knew his rights and agreed to accompany the sheriff's deputies to the patrol headquarters for questioning. Thereafter, he freely and voluntarily answered the officers questioning. Defendant's actions and words clearly constituted waiver of his right to counsel. The question, therefore, is whether defendant subsequently invoked his right to assistance of counsel.

■■■ If an accused in any manner, at any time, expresses a desire to consult an attorney, the interrogation must cease until the accused has an opportunity to confer with counsel and have counsel present during subsequent questioning. *Miranda v. Arizona*, 384 U.S. 436, 473–74, 86 S.Ct. 1602, 1627–28, 16 L.Ed.2d 694, 723 (1966); *State v. Moon*, 183 N.W.2d 644, 648–49 (Iowa 1971). If the accused cannot obtain an attorney and indicates a desire to have counsel present before further questioning, the peace officers must respect the accused's decision. *Miranda*, 384 U.S. at 474, 86 S.Ct. at 1628, 16 L.Ed.2d at 723; *cf. State v. Hilpipre*, 242 N.W.2d 306, 310 (Iowa 1976) (when defendant requested attorney, was provided phone book and called several to no avail, and defendant was uncertain

whether to continue his attempt to secure counsel, there was no voluntary and intelligent waiver of counsel).

Defendant claims that all interrogation should have ceased when he first requested permission to telephone his attorney and should not have resumed absent an affirmative waiver in the presence of his attorney. As support for his contention, defendant relies on *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378, 386 (1981), in which the United States Supreme Court stated:

> [W]e now hold that when an accused has *invoked his right to have counsel present* during custodial interrogation, a valid waiver of that right cannot be established by *showing only that he responded to further police-initiated custodial interrogation* even if he has been advised of his rights. We further hold that an accused, such as Edwards, having *expressed his desire to deal with the police only through counsel*, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges or conversations with the police.

(emphasis added) (footnote omitted). The State maintains that defendant's conduct throughout the course of the interrogation establishes that he continued to waive his right to counsel. The record supports the State's position.

Interrogation ceased on both occasions when defendant requested permission to telephone his attorney. On the first occasion defendant's attorney was asleep; defendant conversed with his wife and was told to call back if defendant was arrested or otherwise found it necessary to consult with counsel. According to the interrogating officer's testimony at the suppression hearing and at trial, he asked defendant what his attorney had said upon reentering the interrogation room. Defendant then asked if he were under arrest and, if so, what the charge was. The officer responded that defendant was not under arrest and was free to go if he wished. The officer

testified that defendant responded that due to the fact that the law enforcement officials were looking for a thirty-one-year-old male named Fred who was driving a blue van he could understand why the officers wanted to question him and that he would stay and talk.

Defendant admitted that he was told he was not under arrest and was free to go. He also testified that his attorney's wife asked if he wanted her to awaken her husband. Defendant said no, but that he would "probably" call back if the questioning continued.

It is clear that on the first occasion defendant did not invoke his right to have counsel present during questioning. Unlike the circumstances in *Edwards*, defendant did not express a desire to deal with the law enforcement officials only through counsel. He was afforded an opportunity to consult with counsel but elected not to have him awakened. Moreover, the State has shown that defendant's continued participation in the interrogation was voluntary. As the Supreme Court stated in *Michigan v. Mosley*, 423 U.S. 96, 102, 96 S.Ct. 321, 326, 46 L.Ed.2d 313, 320 (1975):

> [A] blanket prohibition against the taking of voluntary statements or a permanent immunity from further interrogation, regardless of the circumstances, would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activities, and deprive suspects of an opportunity to make informed and intelligent assessments of their interest.

Accordingly, we find no merit in defendant's contention that all questioning should have ceased when he first expressed a desire to consult with his attorney.

Defendant also contends that the interrogation following his second telephone call violated his right to counsel. On this occasion defendant consulted with his attorney. Defendant testified that he was advised to exercise his right to remain silent and did not answer any further questions. He maintained that he did not voluntarily agree to be photographed and removed his

clothing and allowed his photographs to be taken only because he was directed to do so.

Defendant's testimony was contradicted by the two officers who were interrogating him at that time, however. One of the officers testified:

A. We asked him what his attorney told him to do. We wanted to know if his attorney told him not to talk to us anymore or we couldn't talk to him, we knew that.

Q. What did Mr. Lamp say in response to that inquiry?

A. He told us his attorney told him if he did get arrested, he was supposed to call him back.

Q. Did he ever indicate to you that his attorney indicated to him not to talk to you?

A. No, sir, he didn't say.

Q. Did Mr. Lamp say, regardless of what his attorney told him, that he did not want to talk to you?

A. No, he did not.

Q. Did he seem to cooperate with you at all times during this conversation you were having with him?

A. Yes, sir. I did tell Mr. Lamp that he was not under arrest, that he was free to go if he wished, that he understood that; asked him if he understood that. He said he did.

Q. Did he say anything else about that?

A. Yes, he said that he understood why we wanted to talk to him, that we were just doing our job, you know, he wanted to get it over with.

Q. During the entire period of time that you were either talking to Mr. Lamp or were present while someone else was talking to him, how would you characterize his attitude towards the police officers?

You say he was cooperating with you?

A. Yes, sir. Anything we asked him he voluntarily done; quite cooperative.

Q. At any time did he ever tell you he didn't want to talk to you anymore or he wanted to go home or anything like that?

A. Never did, not once.

On cross examination he stated:

Q. And it's your testimony that he said his lawyer did not tell him to remain quiet?

A. That's correct.

Q. And he freely and voluntarily talked to you after that?

A. That's correct.

The other officer also testified that defendant said that his attorney had not advised him not to talk with the officers and agreed to be photographed.

On the basis of our independent examination of the record, we find the testimony of the two interrogating officers far more credible than that of defendant. The facts, as we find them, reveal that defendant was afforded the opportunity to call his attorney when he requested permission to do so. The officers carefully questioned defendant to determine whether he had been advised to remain silent or desired to terminate the interrogation. It was only after defendant, who had a previous criminal history and stated that he was aware of his constitutional rights, expressed no desire to have counsel present, that interrogation continued. As the *Mosley* court noted, the critical safeguard under *Miranda* is the right to have questioning terminated at any time. 423 U.S. at 103, 96 S.Ct. at 326, 46 L.Ed.2d at 321. While it is inconsistent with *Miranda* "to reinterrogate an accused in custody *if he has clearly asserted* his right to counsel," *Edwards*, 451 U.S. at 485, 101 S.Ct. at 1885, 68 L.Ed.2d at 387 (emphasis added), defendant did not clearly assert his right in this case. His voluntary and active cooperation with the interrogating officers is inconsistent with his contention that he was denied the right to counsel. The record discloses that defendant voluntarily, intelligently, and knowingly waived his right to counsel, as well as his right to remain silent.

V. *Evidence obtained pursuant to search warrant.* Defendant contends the district court erred in overruling his motion to suppress evidence obtained pursuant to a

search warrant. Relying on his arguments in divisions I through IV of this opinion, defendant maintains that the information that provided the basis for the warrant was procured through previous unlawful searches and seizures, which tainted the evidence seized pursuant to the warrant.

Our holdings in divisions I through IV are dispositive of this issue. Since defendant has not shown that the evidence supporting the issuance of the search warrant was obtained unconstitutionally, there is no basis for his present argument.

■ VI. *Alleged hearsay testimony.* During direct examination of a deputy sheriff at trial, the prosecutor asked whether the name of Miss Oliver's ex-boyfriend had come up during the course of the investigation. The deputy responded that it had and that two other deputies had talked with the ex-boyfriend and several of his friends. The prosecutor then asked: "As a result of those discussions, what, if anything, did you do as far as [the ex-boyfriend] was concerned?" Over defendant's objection, the deputy replied: "As a result of the investigation, we were able to eliminate [him] of having any knowledge or participation in the homicide ...." Defendant contends this testimony was offered to prove that the ex-boyfriend had established an alibi and could not have been involved in the homicide. He claims the statement constituted inadmissible hearsay and that the trial court erred in overruling his objection on that basis. We disagree.

This court has adopted the definition of hearsay utilized by the federal rules of evidence: "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c); *State v. Fingert*, 298 N.W.2d 249, 251 (Iowa 1980) (en banc). While assertive conduct, as well as written and oral statements, can constitute hearsay, *State v. Galvan*, 297 N.W.2d 344, 346 (Iowa 1980), here the testifying deputy was not repeating any utterance or assertive act by the other deputies.

The deputy, a sergeant of the criminal investigation division of the sheriff's office, was in charge of the investigation into the death of Miss Oliver. He was therefore in a position to testify *as to the official results* of that investigation on the basis of firsthand knowledge and observation. The prosecutor asked him, in essence, what official action was taken by the sheriff's office with respect to Miss Oliver's ex-boyfriend. The fact that the official action was based upon information received by other officers does not in itself make the testifying deputy's answer hearsay. The testimony was not offered to show any specific statement by the other deputies arising out of their discussions with the ex-boyfriend or his friends, or as an equivalent thereof. As such, it does not fall within the definition of hearsay.

VII. *Chain of custody.* Defendant contends the trial court erred in admitting into evidence testimony concerning analyses performed on blood samples extracted from Miss Oliver and on blood spots contained on clothing he allegedly wore. He claims the State failed to establish a sufficient chain of custody for both the blood samples and the clothing.

■ As a foundational prerequisite to the admissibility of physical evidence, the prosecution is required to show a sufficient custody to establish that the article has not been altered between the time it was obtained and the time it is introduced at trial. *State v. Langlet*, 283 N.W.2d 330, 336 (Iowa 1979). The showing required is that it is reasonably probable that tampering, substitution, or alteration did not occur. *State v. Gibb*, 303 N.W.2d 673, 681 (Iowa 1981). The sufficiency of the showing is dependent on the susceptibility of the article to alteration or substitution. *See State v. Bakker*, 262 N.W.2d 538, 543 (Iowa 1978). Whether the prosecution has established a proper chain of custody is a matter committed to the sound discretion of the trial court; reversal is warranted only when there has been a clear abuse of discretion. *Gibb*, 303 N.W.2d at 681.

A review of the evidence discloses no abuse of discretion with respect to either the blood samples or the clothing.

A. *Blood samples.* One of the physicians who treated Miss Oliver in the emergency room testified that he withdrew a blood sample prior to starting an intravenous infusion of a saline solution. The physician stated that he could not have contaminated the blood sample and that he handed it to a laboratory technician. The technician testified that upon receiving the sample from the physician she divided the blood into four test tubes with approximately fifteen cubic centimeters of blood in two of the tubes and five cubic centimeters in the other two tubes. She said that she labeled the tubes with Miss Oliver's name and performed tests to facilitate treatment of Miss Oliver. She then placed two of the test tubes, which were not used in the tests, in a rack used for temporary storage of blood samples and subsequently gave the two tubes to the medical examiner. She said that there was no doubt that the blood given to the medical examiner was the blood of Miss Oliver and that it could not have been contaminated.

The medical examiner testified that he received the two tubes of blood from the technician and personally delivered them to the evidence technician at the Iowa Crime Laboratory in the same condition they were in when he received them. The evidence technician testified that she received the test tubes from the medical examiner, assigned them a laboratory number, and placed them in a cooler in which all blood samples are kept.

Defendant attacks this chain of custody, however, by pointing to inconsistencies in the record. He notes that although the laboratory technician stated that she gave the medical examiner two fifteen cubic centimeter tubes, one of the tubes received by the evidence technician was in fact a five cubic centimeter tube. He also calls attention to the fact that the medical examiner stated that he believed he received two five cubic centimeter tubes from the technician. Third, he notes that the laboratory techni-

cian testified that she wrote Miss Oliver's name on the tubes. On cross-examination, she stated: "It would have had her last name and I didn't know her hospital ID number so I just put ER1 so I knew which room it would have come from." One of the tubes received by the evidence technician was labeled "Melody Oliver, ER1" and the other was "Melody Oliver." Also on cross-examination, the evidence technician stated that the writing on the labels was that of the medical examiner. Finally, defendant points out that the physician who assisted the medical examiner in performing an autopsy on the body of Miss Oliver testified that he "believed" he withdrew blood samples and sent them to the state criminal laboratory to be blood-typed.

Defendant contends that these items indicate that one of the test tubes that the crime laboratory analyzed was from the laboratory technician and the other was from the autopsy, which he claims could have been affected by blood transfusions received by Miss Oliver. We find no merit in this contention.

First, although the laboratory technician stated that she gave the medical examiner two fifteen cubic centimeter tubes, on redirect examination she stated that she was certain that she gave him one fifteen cubic centimeter tube, but she was unsure about the other tube. Other evidence reveals that the tubes are the same height. When identifying the tubes at trial, the evidence technician stated that the tubes appeared to be the same size; it was only upon closer examination that she was able to discern that the two tubes were of different sizes. Thus, it does not appear significant that the laboratory technician and medical examiner have different recollections as to the size of the tubes, especially considering that more than six months had elapsed between the time the samples were drawn and the time of trial.

Second, the laboratory technician did not explicitly state that she put "ER1" on each tube on which she wrote Miss Oliver's name. And while the evidence technician stated that, as she recalled, the writing on

the tubes was that of the medical examiner, with whose handwriting she was familiar, she said the writing was already on the labels when she received them. Moreover, the medical examiner testified that he received the blood samples from the laboratory technician and delivered them to the evidence technician. He stated that he did not deliver any blood samples taken at the autopsy. He said that when there has been hospital treatment, such as blood transfusions, he obtained blood drawn before such treatment and had that blood analyzed.

Defendant's alleged inconsistencies, at most, constitute speculation that alteration or substitution conceivably could have occurred. When the trial court has determined that the chain of custody shown is sufficient, contrary evidence affects only the weight of the evidence, not its admissibility. *Gibb*, 303 N.W.2d at 681.

Defendant next argues that there is a question whether the blood in the fifteen cubic centimeter tube was contaminated at the crime laboratory prior to the testing that produced evidence linking defendant to the homicide. On cross-examination, defense counsel asked a criminalist who performed tests on the blood samples why a laboratory toxicologist's initials appeared on the fifteen cubic centimeter test tube. He said that the toxicologist "probably analyzed blood from this tube for alcohol and drugs and that type of thing." Defendant points out that the toxicologist was not called to testify at trial and that the laboratory records admitted into evidence show only that he checked the blood out on May 12 and checked it back in on the same date, which raises the question whether the blood was contaminated. Defendant's concern is speculatory. Furthermore, it is not necessary to have every state employee who analyzes evidence testify at trial to show a proper chain of custody, however. There is a presumption that state agents would not tamper with the evidence. *Langlet*, 283 N.W.2d at 337. It is also "presumed that any employee or technician of the criminalistics laboratory is qualified or possesses the required expertise to accomplish any analysis, comparison, or identification done by

him in the course of his employment in the criminalistics laboratory." § 691.2, The Code. It follows that a presumption of regularity attends such an analysis, comparison, or identification; therefore, it is presumed that an employee will perform a blood analysis competently and responsibly, in a manner that will not contaminate the sample or otherwise affect the accuracy of further analysis.

B. *Clothing.* Another state criminalist testified, over defendant's objection, concerning blood comparison analyses between the blood samples withdrawn from Miss Oliver and blood samples taken from items of clothing that were identified as appearing identical to clothing worn by defendant on the evening of the homicide. A park ranger testified that he found the clothing in a ditch at Big Creek State Park on May 12, 1980, after the sheriff's office requested him to search for such clothing. He stated that he immediately notified the sheriff's office and kept the clothing in his office until May 16, when he personally turned it over to a deputy sheriff at the patrol headquarters.

Defendant attacks the chain of custody on the grounds that (1) there was no evidence concerning what was done with the clothing during the four-day period between the time the ranger found the clothing and the time he turned it over to the sheriff's deputy and (2) because the ranger did not testify whether the clothing appeared to be in essentially the same condition with respect to the blood stains when it was presented at trial as it was when he found it. We conclude that absence of such evidence does not establish an abuse of discretion on the part of the trial court.

The ranger testified that he kept the clothing at his office until he turned it over to the sheriff's office. It is presumed that the ranger, as an agent of the state, would not tamper with the clothing. Since blood stained clothing is less susceptible to alteration than blood samples, a less elaborate foundation is required for admission. *See Gibb*, 303 N.W.2d at 681; *Langlet*, 283

N.W.2d at 336–37; *Bakker*, 262 N.W.2d at 543. Further, while this court has stated that an officer should testify whether an article is in the same condition when offered at trial as when received by the officer, *State v. Grady*, 183 N.W.2d 707, 711 (Iowa 1971), failure to do so is not necessarily fatal. The determining factor is whether the trial court abused its discretion in concluding that it is reasonably probable that the article is in the same condition when offered into evidence as it was when received by the officer. The ranger identified the clothing as that which he found. Also, the clothing was in the exclusive custody of state officials from the time it was found until it was admitted into evidence. Moreover, if someone had attempted to alter the blood stains on the clothing, this should have been discovered by the criminalist who analyzed the stains. Defendant's concerns are speculative in nature. Accordingly, we find no abuse of discretion.

Since we find no reversible error, we affirm the judgment and sentence of the trial court.

AFFIRMED.