626 P.2d 851
STATE of New Mexico,
Plaintiff-Appellee,

v.

Joe PEREA, Defendant-Appellant.

No. 4505.

Court of Appeals of New Mexico.

March 3, 1981.
Certiorari Denied April 1, 1981.

Donald Montoya and Dennis Murphy, Montoya, Murphy & Kauffman, Santa Fe, for defendant-appellant.

Jeff Bingaman, Atty. Gen., Reginald J. Storment, Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

## OPINION

WALTERS, Judge.

Charged on an open count of murder, defendant was convicted of murder in the second degree. His appeal lists ten points of error, some of which are further divided into subpoints. We need not respond to all of the issues raised because we are persuaded that, because of improper communications with and among the jury members, it was error to deny a new trial to defendant.

On the eighth day after trial began and as the State neared the end of its case, one of the jurors brought a newspaper into the jury room. It was discovered by a court employee while the jury was absent from the courthouse. The court requested photographs be made of the jury's conference table, and the photographs marked State's Exhibits 2A, 3A and 4A clearly disclose that the July 31, 1979 issue of The New Mexican,

Section B (State's Exhibit 1A) was spread upon the jury table, surrounded by numerous soft drink cans and bottles, coffee cups, and ashtrays. The front page of that section of the paper carried a prominent headline reading "Arms expert implies Perea shot Narvaez," and a three-column story accompanied the headline. The article itself was highly favorable to the State's theory of guilt. The court instructed counsel to consider overnight what steps they wished to take regarding the possible taint of the jury by the newspaper and that he would handle it the following morning when the settling of exhibits continued.

During the course of argument the next day, the bailiff handed a note to the court from one of the jurors, which read:

Judge Kaufman:

I am the one who unwittingly brought in the newspaper. We all avoided the article being fully aware of our responsibility as jurors. We all felt that we should in accordance with your instructions. Possibly I misinterpreted your instructions to exclude all parts of the paper—but most of us were reading it for the sales &, as women will do, for the coupons. We all carefully avoided the article & after this point in time are fairly well versed in the case.

I apologize for my stupidity & hope my mistake will not cause a mistrial or undue acquittal or whatever its called.

[(Signed) * * *]

Prior to ruling on defendant's immediate motion for mistrial or, alternatively, for excuse of the offending juror and replacement by the alternate juror selected, the court conducted an individual voir dire of each juror in the presence of one attorney for the State and one for the defense. Every juror but one admitted seeing the newspaper; eleven denied reading any of it; two admitted to reading the headline but denied reading the article.

It was learned through the individual questioning of the jurors and from affidavits filed after trial by several jury members that (1) the bailiff had told the jury that a defense attorney had elatedly commented that defendant had won his case because of the jury's exposure to the newspaper; (2) the bailiff didn't know what would happen to him for allowing a newspaper to be carried into the jury room; (3) the bailiff advised them that the judge intended to meet with each juror to determine "the impact, if any, which the newspaper would have on reaching an impartial verdict"; and (4) the juror who wrote the note to the judge had stated to other jurors that she did not want an acquittal; that she then prepared and read her note to the jurors and asked each juror to sign it, but the other jury members considered the request "inappropriate." None of the jurors believed these occurrences in any way would or did influence his verdict.

These disclosures, together with the existence of the newspaper article in the jury room, the tenor of the juror's note, and the comments of the bailiff, present influences so corruptive of the sanitation within which a fair trial is supposed to proceed that we are unable to accept the protestations of the State and the assurances of the jurors that "each and every one" of the jury panel was "totally free" from any contamination whatsoever. *State v. McFall*, 67 N.M. 260, 354 P.2d 547 (1960). Such "phlegmatic detachment" is as "boggling" to us in this case as it appeared to the Supreme Court when it reviewed the effect of circumstances known to a jury member outside the evidence produced in court, in *Mares v. State*, 83 N.M. 225, 490 P.2d 667 (1971). Here, the entire panel was subjected to a series of outside mischiefs.

One juror stated in his affidavit that he felt the bailiff's comment regarding the defense attorney's reaction to the newspaper in the jury room "may have had the potential of prejudicing some of the jurors." Another said that the jurors were "stunned and upset" and she "personally was angry that any statement by any party regarding the case being won was made at all because the case had not yet been concluded." The statement reflects resentment toward the defense. Still another juror said that the offending juror announced to all that she

did not want her act of bringing the newspaper to the jury room "to reflect adversely" on the bailiff. The note itself states the "hope" that the juror's "mistake will not cause a mistrial or *undue* acquittal." That comment, read to all the jurors, is susceptible of only one meaning: there existed a preconceived opinion of defendant's guilt in one juror's mind, and that opinion was made known to every other juror at a stage of trial when only the State's case had been heard.

The court never did inquire of the bailiff regarding his conversations with the jurors, even though defense counsel requested that the bailiff be questioned on that matter. Communications of considerably lesser seriousness have routinely been condemned in New Mexico. *See, e. g., State v. McCarter*, 93 N.M. 708, 604 P.2d 1242 (1980), and cases therein cited; and the discussion in *State v. McClure*, 94 N.M. 440, 612 P.2d 232 (Ct.App. 1980). Such communications are presumed prejudicial. *McClure, supra.*

The combination of all of these circumstances and the pressures they exerted upon the jurors, as articulated in the affidavits, compel our reversal. We do not doubt the sincerity of each juror in asserting the impartiality he would observe and the lack of any impact which the chain of events stemming from discovery of the newspaper might have had upon him. Nevertheless, we are nagged by the awareness that among the indisputable vagaries of human nature, self-examination and self-accusation are difficult enough in the privacy of one's mind; they become psychologically, nearly impossible of performance when one is alone in the spotlight of scrutiny by those who will judge his fairness and impartiality. *See Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). Jurors, even though they may have unconscious or subconscious prejudices, *see United States v. Dellinger*, 472 F.2d 340 (7th Cir. 1972), or admitted biases, will "seldom admit inability to act impartially." *State v. Sims*, 51 N.M. 467, 188 P.2d 177 (1947); *State v. Huffman*, 89 Mont. 194, 296 P. 789 (1931). A mistrial should have been ordered by the trial court.

Defendant further argues that the affidavit for search warrant was insufficient; therefore the evidence obtained under the warrant should have been suppressed. We decide this and other suppression issues to prevent re-argument upon remand of this matter.

■ There is no claim that the lack of specificity of the location of the residence to be searched made the warrant a general warrant. *See State v. Ferrari*, 80 N.M. 714, 460 P.2d 244 (1969). The face of the affidavit contains ample information and description of the residence for accurate identification, *see State v. Aragon*, 89 N.M. 91, 547 P.2d 574 (Ct.App.1976), and the fact that the affidavit implies a residential address for defendant different from a mailing address does not detract from the affiant's assertion that the residence to be searched was "believed to belong to Joe Perea." The totality of the information in the four-page affidavit is not stale; the facts asserted by affiant were sufficient to lead the magistrate to an independent conclusion that probable cause existed to believe that the items sought were to be found upon the premises described. *See Ferrari, supra.*

■ Likewise, defendant's contention that defendant's shirt which was seized at the hospital should have been suppressed, presents no error. The emergency room nurse at the hospital took defendant's shirt into safekeeping. She did so as a matter of custom when she believed a crime might be involved. She later turned the shirt over to police. If there was any Fourth Amendment intrusion into defendant's rights, it was not governmental intrusion. *See State v. Ryder*, No. 4622 (Ct.App.), filed January 27, 1981; *United States v. Gumerlock*, 590 F.2d 794 (9th Cir. 1979). An officer who is lawfully in a position which exposes evidence to him does not need a warrant to seize it. *Rodriquez v. State*, 91 N.M. 700, 580 P.2d 126 (1978).

■ The last point requiring discussion also relates to a motion to suppress. Defendant suggests that the chemical tests

made upon his hands at the hospital to determine presence of antimony and barium, absent a search warrant, further violated his Fourth Amendment rights. The tests were made by wiping defendant's hands with a cotton swab soaked in nitric acid solution. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), although concerned with the issue of stop and frisk, recognizes that the reasonableness of a detention is determined by balancing the need to seize for investigatory purposes against the intrusion which the detention entails. Here there was no physical detention; defendant was near death in the hospital. The intrusion was minimal; and because it was hospital procedure to immediately wash and cleanse patients brought to the emergency room, exigent circumstances existed, coupled with probable cause to believe defendant had committed a crime, to allow a search for evidence likely to be imminently destroyed. Under such conditions, acting to preserve possible evidence does not require a search warrant. *Cupp v. Murphy*, 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973). The facts surrounding seizure of this evidence have no similarity to the facts of *Ybarra v. Illinois*, 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), which defendant relies on.

Because we feel the trial court erred in permitting the trial to continue after the newspaper episode occurred, we pass over other trial matters urged as presenting cumulative error. We are confident that improper evidence volunteered by a witness about which the trial court had to caution the jury, and improper hypothetical questions posed by the State, will not be repeated at a second trial.

The conviction is reversed. The matter is remanded for a new trial. It is so ordered.

HERNANDEZ, C.J. and LOPEZ, J., concur.