The slip opinion is the first version of an opinion released by the Clerk of the Court of Appeals. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Clerk of the Court for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

Opinion Number: _____

Filing Date: <u>April 29, 2024</u>

**No. A-1-CA-40425**

**STATE OF NEW MEXICO,**

      Plaintiff-Appellee,

v.

**MARK A. LUCERO JR. a/k/a**
**MARK ANTHONY LUCERO JR.,**

      Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF COLFAX COUNTY**
**Melissa A. Kennelly, District Court Judge**

Raúl Torrez, Attorney General
Santa Fe, NM
Charles J. Gutierrez, Assistant Attorney General
Albuquerque, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Mary Barket, Assistant Appellate Defender
Santa Fe, NM

for Appellant

**OPINION**

**YOHALEM, Judge.**

{1}     Defendant Mark Anthony Lucero, Jr. was convicted, following a jury trial, of three offenses: (1) aggravated battery against a household member by strangulation, (2) false imprisonment, and (3) violation of a restraining order prohibiting domestic violence. Defendant argues that he is entitled to a new trial because eleven of the twelve jurors seated at his trial were biased by having heard "inflammatory" comments made by a member of the jury panel during voir dire. Defendant contends that the district court abused its discretion in failing to dismiss the entire panel at the conclusion of voir dire. Defendant also argues that his convictions for aggravated battery against a household member and false imprisonment are based on the same conduct, violating his right to be free from double jeopardy. Finding no error by the district court in the selection of the jury, and concluding that Defendant's aggravated battery and false imprisonment convictions are based on nonunitary distinct conduct and, therefore, do not subject Defendant to multiple punishments for the same conduct, we affirm.

**BACKGROUND**

{2}     Defendant's jury trial began September 27, 2021, following jury selection. Thirty potential jurors were available for voir dire. The potential jurors were divided into two panels, a first panel of twenty-three, the maximum number that could be

adequately distanced in the courtroom under the COVID-19 protocols, and a second panel of the remaining seven potential jurors. The district court administered the oath to the first panel. All of the members of that panel swore or affirmed that they would truthfully answer the questions asked by the court and by counsel for both parties. Defendant was present in the courtroom with his counsel.

{3}     The district court began by questioning the potential jurors about any hardship that would prevent them from serving during Defendant's anticipated one- to two-day trial. The court then informed the panel that the charges involved domestic violence, and asked whether any of the jurors could not be fair given the nature of the charges. Several potential jurors raised their hands and the court arranged to speak privately with each of them at the conclusion of the panel's voir dire. The court then asked the panel whether anyone had other concerns about serving. Any potential juror who raised a hand was added to the court's list for a private conversation with the court and counsel. The court then allowed counsel for both the State and Defendant to question the panel.

{4}     The State addressed the jury panel first, asking about the potential jurors' understanding of the Fifth Amendment and the beyond a reasonable doubt standard. The court interrupted the discussion to explain to the panel that they would receive specific instructions from the court and would not be making a decision based on their gut feelings. The prosecutor then asked the panel members whether they would

consider a defendant's decision not to testify as a factor in determining the defendant's guilt or innocence. A juror responded that she was not sure. The district court followed up by asking the juror whether she could follow the court's instruction not to consider a defendant's failure to testify, to which she responded that she would try. The court then asked whether there was anyone else who wanted to respond regarding whether they could follow the court's instruction not to consider a failure to testify. Juror 3 then interjected, saying he would not follow the instructions. Juror 3 then stated that he had a natural bias against anyone accused of assault. Juror 3 continued speaking, noting that he had practiced law in another state, and reiterated his bias by stating,

> So, I would say that I have a natural bias immediately. You're going to bring in a guy in for any sort of assault, I'm going to be very inclined to prosecute. Find him guilty.

The prosecutor asked if anyone else agreed with Juror 3. Juror 16 indicated that he too was biased against someone accused of assault.

{5}    Near the end of the prosecution's voir dire, the jury panel was asked whether anyone knew either of the two prosecutors for the State. Juror 3 said that he had some casual contact with one of the prosecutors, and then went on to state,

> I have a natural bias to lean towards [the] prosecution in cases even after my experience with working as a defense attorney. Especially since I learned a few tricks on that side. I think . . . he is pretty much guilty.

The prosecutor responded by asking Juror 3 whether he could be fair and impartial even though he knew one of the prosecutors, to which Juror 3 responded that he could. The prosecutor then asked the panel whether they knew the police officer who would be testifying at trial. Juror 3 disclosed that he knew the officer. When the prosecutor asked Juror 3 if he could be fair and impartial, he answered, "No." The district court interjected, interrupting the prosecutor, and attempting to stop further questioning of Juror 3. The court noted that Juror 3 had already stated that he could not be fair and impartial.

{6}    Defense counsel then was given an opportunity to voir dire the panel members. Despite the district court's comment that Juror 3 had already stated on the record that he could not be fair and impartial, defense counsel continued to question Juror 3 about whether he could be fair and impartial. The district court again interrupted, telling defense counsel that Juror 3 had already stated his "his inability to be fair and impartial multiple times on the record." Juror 3 can be heard in the background responding to the district court's comment by stating, "Yeah, I think that guy is guilty." The court continued speaking, apparently attempting to avoid any further opportunity for Juror 3 to expound on his already stated bias. Defense counsel interrupted the court, and continued to question Juror 3 about whether he could be fair and impartial despite his comments strongly favoring the prosecution: The following exchange between defense counsel and Juror 3 occurred.

Defense Counsel: So . . . you believe that when someone is accused of a crime, they're probably guilty?

Juror 3: No. I believe that when the guys have done their background work and they've brought it to this stage of the legal process, there's enough merit that it smells real bad and it should be prosecuted, and it's highly likely that he should be prosecuted to the tenth letter of the law. . . .Certain behaviors should never be tolerated or accepted in our society.

Defense Counsel: So were you retired law enforcement as well?

Juror 3: You could say that.

Defense Counsel: Ok. So as a law enforcement officer, you understand that the job is to enforce the laws and the Constitution of the United States, correct?

Juror 3: So that's part of it. That's how officers have full discretion.

District Court: Yeah, I'm going to, I'm going to stop this. I'm going to ask you to stop [Juror 3]. I'm going to ask you to stop.

Juror 3 (talking over the Judge): I have personal knowledge.

District Court: [Juror 3] I asked you to stop. In fact, I am going to ask [the bailiff] to escort [you] out of the courtroom please.

{7} After Juror 3 was escorted out of the courtroom, the district court addressed the remaining panel members. The court asked whether anyone who had not already indicated bias in favor of the prosecution was persuaded by Juror 3 that Defendant is guilty. The court asked,

When [Juror 3] says, "I know he is guilty," does that, did that persuade you to believe now that this Defendant is guilty because [Juror 3], a former lawyer, law enforcement officer, prosecutor, [and] defense

5

attorney believes that? Anybody believe that this Defendant is guilty because [Juror 3] stated that multiple times? Anyone? Raise your hand.

No one raised their hand.

{8} The district court then gave defense counsel an opportunity to continue with voir dire. Defense counsel began by explaining to the panel that the purpose of voir dire was to ensure that those who serve on a jury are fair and impartial and stated,

The purpose of this voir dire is to find people that are fair and impartial. . . . The Constitution says this is an innocent man. As we sit here, right here, he is innocent unless or until he is proven guilty beyond a reasonable doubt. So, does anybody think that just because he is sitting here accused that he is automatically guilty?

None of the panel members raised their hands or otherwise responded affirmatively.

{9} Defense counsel then turned to questions about other areas of potential bias and to hardship that might prevent members of the panel from serving on the jury. Defense counsel concluded her voir dire shortly thereafter. Defense counsel did not ask about the ability of the potential jurors to be fair and impartial in light of the comments made by Juror 3, nor did defense counsel inquire further about whether Juror 3's comments had influenced or affected them.

{10} At the conclusion of the voir dire, the district court called Juror 3 back into the courtroom outside the presence of the jury panel and admonished him for failing to stop talking when ordered to do so by the court. The court told Juror 3 that when he says something like "he's guilty," that he "could actually be tainting the whole jury pool." The court excused Juror 3 and then brought those panel members who

had indicated they wanted to speak privately to the court and counsel in one at a time. None of the concerns raised related to Juror 3's comments.

{11} With the voir dire completed, the district court then discussed with counsel, outside of the presence of the jury panel, which potential jurors should be excused for cause. The court sua sponte struck Juror 3, Juror 2, and Juror 5, all of whom had stated obvious bias. The court excused two other jurors (Juror 8 and Juror 20) who had indicated during voir dire that they knew people involved in the case, and a third (Juror 16) who had answered questions in a way that the court believed indicated that they wanted to be excused. The prosecutor suggested that Juror 4 should be excused for cause based on his statement that he would draw a conclusion against Defendant if Defendant did not testify. When defense counsel waived exclusion of Juror 4, explaining that Defendant intended to testify, the prosecutor repeated her request for Juror 4's excusal, saying that the State could not agree to a biased juror. In response, defense counsel retorted that if the prosecutor really wanted a fair jury, she would address Juror 3's comments, because the comments had tainted the entire panel. Defense counsel stated,

> [Juror 3] has clearly tainted this jury. I don't think that the statements he made could be ignored. He made those statements in front of everyone. Quite frankly your honor, I think he is doing it purposefully. . . . The fact that he is former law enforcement. The fact that he was sworn in as an attorney somewhere. He knew what he was doing and he kept doing it. But he went way too far on the last one saying, "Oh he's absolutely guilty. He's guilty." So if that's the State's position, that

they must ensure a fair trial, I would say that the jurors that were in this room this morning have been tainted.

{12} The district court asked the State for a response. The prosecutor explained that she believed that the court's questioning of the panel about Juror 3's comments adequately showed the jury had not been biased by Juror 3. The prosecutor distinguished her objections to Juror 4, whom she described as subject to excusal because he explicitly stated that he could not be fair and impartial. At the end of this discussion, the district court denied the prosecutor's request to excuse Juror 4 for cause. Again, Defense counsel did not raise the question of whether the panel as a whole was biased by Juror 3's comments with the court, nor did defense counsel move to excuse the entire panel or any particular potential juror for cause, or ask to call any potential jurors back for further questioning about the impact of Juror 3's comments on their ability to be fair and impartial.

{13} The court and counsel, instead, turned to excusals for cause based on conflict with potential jurors' work schedules. These were rejected because of the court's concern that given the number of excusals for cause and the number of preemptory challenges yet to be exercised, there might not be enough potential jurors among the two panels to choose twelve jurors and two alternates.

{14} The court then proceeded to preemptory strikes: five for the defense and three for the State. At the conclusion of these strikes, eleven jurors had been selected from the first panel.

{15} The court proceeded to voir dire the second panel that afternoon, seating a twelfth juror and two alternates from the second panel of seven potential jurors.[1] The case proceeded to trial and resumed the next morning.

{16} The facts relevant to Defendant's double jeopardy claim will be included in our discussion of that issue.

**DISCUSSION**

**I.     The District Court Did Not Abuse Its Discretion in Not Dismissing the Jury Panel**

{17} Defendant first argues that the district court violated his right to a fair and impartial jury by failing to excuse the remaining members of the first panel after Juror 3, an attorney and former law enforcement officer, expressed his belief multiple times during voir dire that any defendant brought to trial by the criminal justice system for a violent crime is guilty. Defendant contends that the district court's failure to dismiss the entire panel sua sponte requires reversal and a new trial.

{18} The State contends that in order for Defendant to prevail on an argument that a potential juror's comments during voir dire tainted the entire jury panel, Defendant has the burden of establishing that the comments "unfairly affected the jury's deliberative process and resulted in an unfair jury." *See State v. Mann*, 2002-NMSC-

---

[1]We note that contrary to Defendant's suggestion on appeal, due to the number of panelists, the district court could not have seated a jury of twelve from the second panel alone had the entire first panel been excused. The trial would have had to be postponed, and a jury selected from a new venire.

001, ¶ 20, 131 N.M. 459, 39 P.3d 124. The State asks this Court to affirm based on the failure of Defendant to elicit any evidence showing that Juror 3's comments biased any of the eleven jurors seated from the first panel.

{19} We agree with the State that Defendant is required to show bias where the allegedly prejudicial comments were made in open court, as they were here. There is no presumption of prejudice under these circumstances; Defendant is required to point to evidence of actual bias. Defendant having had the opportunity to voir dire the potential jurors, and having failed to produce any evidence of actual bias based on Juror 3's comments, the district court did not abuse its discretion in seating eleven jurors from that panel. We explain.

{20} "We review the [district] court's rulings regarding the selection of jurors for an abuse of discretion." *State v. Johnson*, 2010-NMSC-016, ¶ 31, 148 N.M. 50, 229 P.3d 523 (text only) (citation omitted). The abuse of discretion standard is applied recognizing that "the [district] court is in the best position to assess a juror's state of mind, based upon the juror's demeanor and credibility." *Id.* (internal quotation marks and citation omitted). "An abuse of discretion exists when the [district] court acted in an obviously erroneous, arbitrary, or unwarranted manner." *Id.* (internal quotation marks and citation omitted).

{21} In examining whether statements heard by a juror or potential juror require the exclusion for cause of other potential jurors or the replacement of seated jurors

with an alternate, our courts draw a clear distinction between comments heard outside the courtroom, and comments made by a juror or potential juror in open court. *See State v. Price*, 1986-NMCA-036, ¶ 29, 104 N.M. 703, 726 P.2d 857. Where a potentially prejudicial statement is heard by a juror or potential juror in the hallway, at home, or through the media, such a comment is viewed by this Court as presumptively prejudicial, requiring the exclusion of any juror who heard the communication unless the State demonstrates the absence of prejudicial content. *See State v. Gutierrez*, 1967-NMCA-024, ¶ 17, 78 N.M. 529, 433 P.2d 508 (holding that "any unauthorized communication [with a juror or potential juror outside the courtroom] is presumptively prejudicial").

{22} In contrast, where the parties are present with their counsel in open court, and an improper comment is made by another juror or potential juror, there is no presumption of prejudice. *See Price*, 1986-NMCA-036, ¶ 29 (holding that when a defendant "complains of juror conduct, which occurred in open court, in defendant's presence . . . no presumption [arises]; defendant has the burden of demonstrating prejudice). It is the party seeking to exclude the jurors or potential jurors who heard the comment, or to have the court declare a mistrial, who bears the burden of proving that the jurors were actually biased by comments made or questions asked during voir dire and could no longer be fair and impartial. *See id.* This rule has been held to apply when a defendant claims on appeal that questions asked by a prosecutor during

11

voir dire prejudiced the jury. *See Johnson*, 2010-NMSC-016, ¶ 31 ("The challenging party bears the burden of proving jury bias.").

{23} In this case, during voir dire, Juror 3 disclosed his own bias against anyone accused of a violent crime and brought to trial by the criminal justice system. Defendant, his counsel, the prosecutors, and the judge were all present in the courtroom and the proceedings were on the record. Juror 3 not only stated his bias, but also went on to explain his reasons for his belief that all defendants brought to trial on a violent crime were guilty. Juror 3 based his opinion on his experience as an attorney and former law enforcement officer, mentioning specifically that "some [of the] tricks he learned" as a defense attorney made him believe that anyone brought to trial was guilty.

{24} Although the district court interrupted when Juror 3 began to restate his bias against defendants accused of violent crimes, attempting to prevent Juror 3 from repeating his comments, defense counsel did not halt her questioning of Juror 3, and, as a result, Juror 3 had the opportunity to make the same comment multiple times.[2]

---

[2]The State asks this Court to decide this appeal against the defense based on the doctrine of invited error. Although we recognize that Juror 3 may have been given an opportunity to expand or repeat his comments due to defense counsel's continued questioning of Juror 3, aimed at establishing whether he could set his bias aside and be fair and impartial, this is not the kind of intentional contribution to a ruling of the court that defines invited error. *See Chris L. v. Vanessa O.*, 2013-NMCA-107, ¶ 27, 320 P.3d 16 ("Invited error occurs where a party has contributed, at least in part, to perceived shortcomings in a trial court's ruling, and, as a result,

Juror 3 ignored the court's direct order to stop talking and this, of course, also contributed to his biased comments being heard multiple times by the jury.

{25}     Although it is possible that some comments made in the presence of potential jurors by a panel member or by counsel may be so inherently prejudicial that the nature of the comment alone is sufficient evidence that the impartiality of the jury was compromised, this is not such a case. Juror 3's statements were based on his past experience. They did not communicate specific extraneous information about Defendant, or about the events leading to his prosecution. It is evidence of prior bad acts of the defendant or about the events that form the basis of the charges to be heard by the jury that have been held to be inherently prejudicial. *See State v. Perea*, 1981-NMCA-033, ¶¶ 14-15, 95 N.M. 777, 626 P.2d 851 (holding that juror exposure by another juror to a newspaper article suggesting that the defendant was guilty required a new trial). A comment by a potential juror showing bias against a category of defendants or a type of crime, based solely on a juror's past experience unrelated to the particular defendant, has been found to be less inherently prejudicial. *See Mann*, 2002-NMSC-001, ¶¶ 23-24 (distinguishing extraneous information directly related to the specific case from more general information about similar events known to a juror from past experience, and finding only the directly related

---

the party should hardly be heard to complain about those shortcomings on appeal." (text only) (citation omitted)).

information sufficiently prejudicial on its face to require reversal without additional evidence of actual bias).

{26} Given then that Juror 3's comments were made in open court, and that they did not concern Defendant or the events at issue in his case, but instead concerned similar events based on his past experience, the district court did not abuse its discretion when it responded to Juror 3's comments by excluding Juror 3 from the courtroom, excusing him for cause, and inquiring of the remaining panel members about the impact of Juror 3's comments on their belief as to Defendant's guilt. *See State v. Gardner*, 2003-NMCA-107, ¶ 9, 134 N.M. 294, 76 P.3d 47 (holding that the district court responds properly when it investigates biased comments from a panel member to determine whether any potential juror who heard the comments actually shares the bias of the speaker).

{27} Because the burden of showing actual bias on the part of the potential jurors who heard Juror 3's comments in open court during voir dire is on Defendant, the party seeking their exclusion for cause, Defendant cannot now obtain a new trial by arguing that the district court failed to do enough to establish the impartiality of the remaining panel members. Defendant does not claim that he was denied the opportunity to freely question the remaining potential jurors after Juror 3 was excluded from the courtroom and after the court questioned the panel. Indeed, the

court provided defense counsel with an opportunity to freely question the remaining jurors immediately after its question to the panel was answered.

{28} If Defendant believed that the court's inquiry was insufficient, and that further questioning of some or all of the remaining panel members was needed, "Defendant could have proceeded with additional voir dire of the remaining jurors, an appropriate next step if further investigation was needed." *See id.* ¶ 13. Defense counsel, instead, admonished the panel about their duty to be fair and impartial, and then asked the panel, "So, does anybody think that just because he is sitting here accused that he is automatically guilty?" No juror indicated that they believed the accused is "automatically guilty" in response to defense counsel's question. Defense counsel then turned to questions about other areas of potential bias and hardship.

{29} Having had the opportunity to voir dire the potential jurors to either discover any actual bias related to Juror 3's comments, or to firmly disprove bias arising from those comments, Defendant "cannot now obtain relief [on appeal] in the form of a new trial" by claiming that the district court failed to do enough to disprove juror bias. *See id.*; *see also State v. Sanchez*, 1995-NMSC-053, ¶ 11, 120 N.M. 247, 901 P.2d 178 ("[B]y failing to question the juror during voir dire, [Defendant] waived any objection to the juror's participation in the trial.").

**II.  Defendant's Convictions for Aggravated Battery Against a Household Member by Strangulation, and False Imprisonment Do Not Violate the Double Jeopardy Clause**

{30}   Defendant next contends that his convictions for aggravated battery against a household member by strangulation, contrary to NMSA 1978, Section 30-3-16(C)(3) (2018), and false imprisonment, contrary to NMSA 1978, Section 30-4-3 (1963), violate his right to be free from double jeopardy. We disagree.

**A.   Background Relevant to Defendant's Double Jeopardy Claim**

{31}   The State presented the following evidence during trial relevant to Defendant's double jeopardy claim. On December 4, 2019, when the events at issue occurred, Defendant and Victim were in an on- and off- relationship. Victim invited Defendant to her apartment. He arrived sometime later. The two eventually went into her bedroom.

{32}   While in Victim's bedroom, Defendant and Victim began to argue. Defendant put his entire body on top of Victim, who was lying on the bed, and, while holding her down with his weight, put his hands around her neck, briefly stopping her from breathing. He then took Victim's phone from her. When Defendant calmed down, Victim requested her phone back, and he returned it to her.

{33}   Approximately ten minutes after the first incident, Defendant once again got on top of Victim, and strangled her to the point "where [she] couldn't breathe at all," and "started to see stars." This time, when Defendant allowed her to get up, Victim

16

sent her grandmother a text message asking her to call the police. Defendant saw Victim's text message and fled before the police arrived. Victim testified that she did not seek help until after this second incident because Defendant had "calmed down" and she thought she was safe.

{34} Dr. Ralph Holtsworth, an emergency room physician, treated Victim a few hours after these incidents. Dr. Holtsworth testified that Victim reported two events of strangulation: a first incident where Defendant approached her neck "from the front with both hands," and another, which Victim described to Dr. Holtsworth as was "much worse," and caused her to see stars, which Dr. Holtsworth described as an indication of potential brain damage. Dr. Holtsworth testified that he found Victim's injuries to be consistent with her version of being restrained and strangled by Defendant two times.

**B.    Standard of Review**

{35} We apply a de novo standard of review to a double jeopardy claim. *See State v. Cummings*, 2018-NMCA-055, ¶ 6, 425 P.3d 745. The Double Jeopardy Clause of the Fifth Amendment of the United States Constitution, made applicable to the states by the Fourteenth Amendment, protects against "multiple punishments for the same offense." *State v. Sena*, 2020-NMSC-011, ¶ 44, 470 P.3d 227 (internal quotation marks and citation omitted). Defendant does not argue that the New Mexico Constitution affords him greater rights than the Fifth Amendment, so we review

17

Defendant's claim only pursuant to the federal right. *See id.* (reviewing double jeopardy claims only pursuant to the Fifth Amendment when the defendant does not argue that the New Mexico Constitution affords greater protections than the United States Constitution).

**C.     Defendant's Double Description Claim**

{36}     Defendant raises what is known as a double description claim. A double description violation of double jeopardy occurs when an individual is convicted of more than one offense under different statutes for a single act or course of conduct. *See State v. Vigil*, 2021-NMCA-024, ¶ 17, 489 P.3d 974. Defendant argues that he was convicted of both aggravated battery of a household member by strangulation and false imprisonment based on his conduct in restraining Victim with his body and strangling Victim, which he claims was a single, unitary course of conduct.

{37}     Double description claims are subject to the two-part test adopted by our Supreme Court in *Swafford v. State*, 1991-NMSC-043, ¶ 25, 112 N.M. 3, 810 P.2d 1223. "The first part [of the test] focuses on the conduct and asks whether the conduct underlying the offenses in unitary, i.e., whether the same conduct violates multiple statutes." *Sena*, 2020-NMSC-011, ¶ 45 (alteration, internal quotation marks, and citation omitted). Because we conclude that the evidence at trial established that Defendant engaged in two acts, separated by sufficient indicia of distinctness, his conduct was not unitary. The first part of the double description test

18

is, therefore, dispositive, and we need not proceed to the second part of the test, which examines "whether the [L]egislature intended to create separately punishable offenses" based on the same conduct. *Id.* ¶ 45.

**D.     The Conduct Underlying Defendant's Convictions Was Not Unitary**

{38}     In determining whether Defendant's conduct is unitary, we must determine whether the two offenses the jury found Defendant committed were separated by "sufficient indicia of distinctness." *Swafford*, 1991-NMSC-043, ¶ 26.

{39}     Our Supreme Court recently held that in determining whether the conduct forming the basis of each conviction in a double description case is sufficiently distinct to avoid a double jeopardy violation, our courts should rely on the six factors identified in *Herron v. State*, 1991-NMSC-012, ¶ 15, 111 N.M. 357, 805 P.2d 624. *See State v. Phillips*, ___-NMSC-___, ¶ 38, ___ P.3d ___ (S-1-SC-38910, Mar. 4, 2024) (holding that New Mexico applies the *Herron* factors to determine whether there is distinct conduct in double description cases). The factors considered in *Herron* include: "(1) temporal proximity of the acts, (2) location of the victim during each act, (3) the existence of intervening events, (4) the sequencing of the acts, (5) the defendant's intent as evidenced by his conduct and utterances, and (6) the number of victims." *Phillips*, ___-NMSC-___, ¶ 12. In evaluating these factors, we look to "the elements of the charged offenses, the facts presented at trial, and the instructions given to the jury." *Id.* ¶ 38 (internal quotation marks and citation

omitted). "The proper analysis is . . . whether there are sufficient facts in the record to support distinct conduct" thereby defeating a double jeopardy claim. *Id.* ¶ 41 (internal quotation marks and citation omitted).

{40} As to the offense of aggravated battery by strangulation, the jury instructions directed the jury to convict if it found that Defendant "touched or applied force to [Victim] by strangling her." The jury instruction for false imprisonment informed the jury that it must convict if it determined that Defendant "restrained or confined [Victim] against her will." Although the false imprisonment instruction does not mention strangulation, the State, in its closing argument, told the jury that Defendant had confined Victim by strangulation, stating that "mounting someone and applying pressure to their neck is inherently . . . confining." We, therefore, assume that the jury relied on Defendant's conduct in strangling Victim to convict of both offenses.[3]

{41} We next turn to the evidence at trial to determine whether there are sufficient facts in the record to support two distinct, nonunitary acts of strangulation by

---

[3]Even if the State had not argued that the conduct in committing the two offenses was the same, we would be required by the *Foster* presumption to assume that the two offenses were committed the same way. *See State v. Foster*, 1999-NMSC-007, ¶ 28, 126 N.M. 646, 974 P.2d 140 (holding that because we cannot assume that jurors will know how to reach a verdict without violating the Double Jeopardy Clause, "we must presume that a conviction under a general verdict requires reversal if the jury is instructed on an alternative basis for the conviction that would result in double jeopardy, and the record does not disclose whether the jury relied on this legally inadequate alternative"), *abrogated on other grounds by Kersey v. Hatch*, 2010-NMSC-020, ¶ 17, 148 N.M. 381, 237 P.3d 683.

20

Defendant. Distinct conduct is supported by evidence in the record that "one crime is completed before another is committed," or "when the force used to commit a crime is separate from the force used to commit another crime." *Phillips*, ___-NMSC-___, ¶ 38 (internal quotation marks and citation omitted). As previously noted, this Court also looks to the six factors adopted by our Supreme Court in *Herron*, 1991-NMSC-012, ¶ 15, to determine whether there are sufficient facts in the record to support distinct, nonunitary conduct. *See Phillips*, ___-NMSC-___, ¶ 38.

**{42}** We conclude that the evidence in the record is sufficient to support conviction of each offense—aggravated battery by strangulation and false imprisonment of Victim—based on distinct conduct. Victim testified that she and Defendant argued after Defendant's arrival at her house. Defendant then mounted on top of Victim on her bed, with the full weight of his body on her, and strangled her with his hands around her neck from the front. Victim testified that Defendant stopped strangling her after "a second." Defendant then took Victim's phone. A period of approximately ten minutes followed, during which Defendant calmed down enough that Victim was comfortable asking him to return her phone, and he did. Victim testified that she did not send her grandmother a text message asking her to call the police when she got her phone back because Defendant had "calmed down" and she no longer felt that he was likely to strangle her again.

{43} After these approximately ten minutes, Defendant again got on top of Victim on the bed and again strangled her. Victim testified that this second time, she could not breathe for so long that she began to lose consciousness and saw stars. Dr. Holtsworth, the emergency room physician who examined and treated Victim, said that Victim described this second incident as "much worse." Dr. Holtsworth also testified that he found Victim's injuries to be consistent with her description of two acts of strangulation.

{44} This evidence of two acts by Defendant, separated by ten minutes during which Defendant calmed down sufficiently to be willing to return Victim's phone, is sufficient to establish that each conviction was supported by distinct, nonunitary conduct. The evidence shows that the first crime, restraining or confining Victim by mounting on top of her and briefly strangling her, was completed ten minutes before Defendant committed a second crime, this time strangling Victim for a much longer period of time. Additionally, the second time, the strangulation was accompanied by force sufficient force to cut off her breath completely, so that she nearly lost consciousness and saw stars. *See Phillips*, \_\_\_-NMSC-\_\_\_, ¶ 38 ("Unitary conduct is not present when one crime is completed before another is committed, or when the force used to commit a crime is separate from the force used to commit another crime." (internal quotation marks and citation omitted)). The time between the two

22

acts, the intervening events that transpired between the two acts, and the change in Defendant's intent, all support the distinct, nonunitary nature of the two offenses.

**{45}**   Because Defendant's conduct was not unitary, we conclude that Defendant's convictions for false imprisonment and aggravated battery by strangulation do not result in a violation of the double jeopardy clause.

**CONCLUSION**

**{46}**   Finding no error, we affirm the district court's entry of judgment and sentence.

**{47}**   **IT IS SO ORDERED.**


_____

**JANE B. YOHALEM, Judge**

**WE CONCUR:**


_____
**KRISTINA BOGARDUS, Judge**


_____
**SHAMMARA H. HENDERSON, Judge**